UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

NICOLE RICHARD,

      Plaintiff,

vs.                          Case No. 4:16cv00184-MX/CAS

GEICO GENERAL INSURANCE COMPANY,
A foreign corporation,

      Defendant.
_____/

## **Defendant GEICO's Motion for Final Summary Judgment**

Defendant GEICO General Insurance Company ("GEICO"), pursuant to

Rule 56, Fed.R.Civ.P., Local Rule 56.1, and the Court's Amended Scheduling and

Mediation Order [DE 31], moves for final summary judgment.

## **I. Introduction and Summary of the Argument**

Plaintiff seeks uninsured motorist coverage ("UM coverage") for an

automobile accident that occurred on March 27, 2011.  However, the GEICO

insurance policy at issue (the "Policy") did not provide for UM coverage at the

time of the accident.  On March 8, 2007, Plaintiff's father and the named insured,

Oscar Richard, electronically signed a statutorily compliant and approved UM

waiver form (the "M-9 Form") rejecting UM coverage.

Pursuant to § 627.727, Fla. Stat. (2007), this signed M-9 Form creates a conclusive presumption that Mr. Richard knowingly rejected UM coverage on behalf of himself and all insureds covered by the Policy.  Florida law only permits a plaintiff to overcome this conclusive presumption through one of three extraordinary circumstances: fraud, forgery, or trickery.  While Plaintiff alleges "trickery" in connection with GEICO's online application process, this claim fails because Plaintiff's allegation is both factually and legally unsupported.

Additionally, summary judgment in GEICO's favor is warranted because Mr. Richard orally rejected UM coverage, and Mr. Richard's receipt of eight renewal notices prior to the accident constitutes a waiver of UM coverage.  Lastly, Plaintiff's cause of action for breach of contract fails as a matter of law because the Policy, by its clear terms, did not provide UM coverage.  Therefore, because the Policy did not include UM coverage, Plaintiff is unable to establish that GEICO breached the Policy by not paying UM benefits.

## II. Statement of Facts

1.     On March 7, 2007, Mr. Richard completed a GEICO application for automobile insurance online.  Affidavit of Christopher Smith, DE 43-1 at ¶ 5 ("Smith Aff."); DE 43-6, p. 7.[1]

---

[1] Pursuant to the Court's Amended Scheduling and Mediation Order [DE 31], all exhibits referenced in this motion are attached to GEICO's Notice of Filing

2.      GEICO provided Mr. Richard with an insurance quote based on insurance coverage selections that he made during the online application process. Smith Aff. at ¶ 6 (DE 43-1).  During this online application process, Mr. Richard had an opportunity to select UM coverage.  *Id.*

3.      While Mr. Richard completed an application online on March 7, 2007, he did not purchase an insurance policy online – he merely received a premium quote.  Smith Aff. at ¶ 7 (DE 43-1).  Mr. Richard then called GEICO on March 7, 2007 to review his application, coverages, and to purchase the policy.  *Id.* GEICO's licensed sales agent, James Battaglia, handled this call.  *Id.*; Affidavit of James Battaglia, DE 43-2 at ¶ 5 ("Battaglia Aff.")

4.      Mr. Battaglia and Mr. Richard discussed coverage options, including UM coverage.  Smith Aff. at ¶ 8 (DE 43-1); Battaglia Aff. at ¶ 6 (DE 43-2). GEICO's and Mr. Battaglia's standard business practice at the time of the call required a GEICO sales agent, such as Mr. Battaglia, to recommend UM coverage and to explain the nature of UM coverage to a potential customer during the application process.  Smith Aff. at ¶ 8 (DE 43-1); Battaglia Aff. at ¶ 6 (DE 43-2). This recommendation was part of GEICO's routine business practice of recommending "gaps" in coverage – a process that occurred during every sales

---

Exhibits in Support of Motion for Final Summary Judgment [DE 43].  The exhibits shall be identified in this motion as DE 43-___.

call.  *Id*.  GEICO required its sales agents to specifically use the word

"recommend" when offering customers, like Mr. Richard, the opportunity to

purchase UM coverage.  *Id.*  Additionally, Mr. Battaglia was required to confirm in

his computer system that he recommended UM coverage to the customer, together

with other potential gaps in coverage.  *Id.*

5.     After Mr. Richard rejected UM coverage during his call with Mr.

Battaglia on March 7, 2007, Mr. Battaglia's and GEICO's standard business

practice was to advise Mr. Richard that, in order to complete his rejection of UM

coverage, Mr. Richard had to review and sign the M-9 Form.  Smith Aff. at ¶ 9

(DE 43-1); Battaglia Aff. at ¶ 7 (DE 43-2).

6.     Because Mr. Richard had an email address, Mr. Battaglia told Mr.

Richard that he would receive an email from GEICO instructing him to complete

the M-9 Form online via GEICO's website.  Smith Aff. at ¶ 10 (DE 43-1);

Battaglia Aff. at ¶ 8 (DE 43-2).  Additionally, Mr. Battaglia told Mr. Richard that

Mr. Richard must complete the M-9 Form to avoid GEICO adding UM coverage to

the Policy.  *Id*.  Mr. Battaglia advised Mr. Richard that, if he did not sign the M-9

Form, GEICO would add stacked UM coverage to the Policy.  *Id*.  Furthermore,

Mr. Battaglia's and GEICO's standard practice was to provide the customer, such

as Mr. Richard, with a price quote for the policy if stacked UM coverage were

added.  *Id*.  In other words, if Mr. Richard wanted stacked UM coverage, as

alleged in this lawsuit, Mr. Richard could simply refrain from signing the M-9

Form and GEICO would automatically add stacked UM coverage to the Policy. *Id.*

7.     On March 7, 2007, GEICO emailed to Mr. Richard Policy documents,

such as a verification of coverage and insurance identification cards, to Mr.

Richard's email address, orichard@tampabay.rr.com.  Smith Aff. at ¶ 11 (DE 43-

1); *see also* Oscar Richard Deposition at DE 43-5, 11:13-24 ("O. Richard Depo.")

(Mr. Richard confirmed the accuracy of this email address).

8.     GEICO's Policy Log Notes, which reflect activity associated with a

customer's policy, evidence that the above-referenced documents, referred to as a

"binder" on the Policy Log Notes, and identification cards were emailed to Mr.

Richard on March 7, 2007 at 7:06 p.m.  Smith Aff. at ¶ 11 (DE 43-1); *see also* the

Policy Logs Notes, which are attached as DE 43-7, at pp. 2-3.

9.     The verification of coverage documents sent to Mr. Richard on March

7, 2007 specifically reflect – on three separate pages corresponding to the three

vehicles insured – that Mr. Richard rejected UM coverage.  Smith Aff. at ¶ 12 (DE

43-1); *see also* the verification of coverage documents attached as DE 43-8.  The

coverage page enclosing the verification of coverage documents and the insurance

cards reflect that it was sent on March 7, 2007 at 7:06:24 p.m., thus corresponding

to the time and date stamp on the Policy Log Notes.  *See* verification of coverage

documents at DE 43-8; *see also* Policy Log Notes at DE 43-7.

10.     On March 8, 2007, Mr. Richard logged into GEICO's online website and completed the M-9 Form, which confirmed his choice of rejected UM coverage.  Affidavit of Pamela Bates, DE 43-3 at ¶ 8 ("Bates Aff.").

11.     The M-9 Form that Mr. Richard electronically signed on March 8, 2007 was approved by the State of Florida Office of Insurance Regulation ("OIR") on January 30, 1997.  Affidavit of Danielle Franklin, DE 43-4 at ¶¶ 7, 11 ("Franklin Aff."); *see also* DE 43-9 and DE 43-10.[2]

12.     When Mr. Richard created his GEICO username and password, he was also required to create two security questions in the event that he forgot his account password.  Bates Aff. at ¶ 9 (DE 43-3).  Mr. Richard's security questions reflect that the street that he grew up on was "sheraton," and the name of his first pet was "fritz."[3]  *Id.*; *see also* the User Profile Administration at DE 43-11.  Mr. Richard confirmed at deposition that these security questions reflected correct

---

[2] The GEICO M-9 Form at issue here, version M-9-FL (11-96), was held to create a conclusive presumption of a knowing rejection of UM coverage in *Brannan v. GEICO Indem. Co.*, 569 Fed. Appx. 724, 727 (11th Cir. 2014) and *Schabo v. GEICO Gen. Ins. Co.*, Case No. 06-61906-CIV Cooke/Brown, DE 59, FN 1 (S.D. Fla. Jan. 18, 2008), *aff'd*, No. 08-10632 (11th Cir. July 10, 2008) ("The M-9FL form has been approved by the Florida Department of Insurance as being in compliance with Florida law.").  Additionally, DE 43-9 and DE 3-10 are self-authenticating pursuant to Rule 902, Fed.R.Evid.

[3] Prior to filing this information, undersigned counsel contacted Plaintiff's and Mr. Richard's counsel to see if counsel or Mr. Richard had an objection to including this information in the motion.  Opposing counsel replied that GEICO may include this information in the motion.

information.  O. Richard Depo. at DE 43-5, 11:21-12:5.  Mr. Richard was required to establish his username and password in order to electronically sign the M-9 Form.  Bates Aff. at ¶ 10 (DE 43-3).

13.     The Policy Log Notes reflect that, at 5:15 p.m., Mr. Richard reviewed and electronically signed the M-9 Form.  *See* DE 43-7 at p. 2; *see also* Bates Aff. at ¶ 11 (DE 43-3).

14.     GEICO also recorded the screens that Mr. Richard viewed when he electronically signed the M-9 Form.  Bates Aff. at ¶ 12 (DE 43-3).  Screenshots of this entire process are attached as DE 43-12; Bates Aff. at ¶ 12 (DE 43-3).  Page 1 of DE 43-12 reflects that Mr. Richard began this process on March 8, 2007 at 5:14:28 p.m.  Page 2 requested that Mr. Richard "Review and agree to sign the Consent Form," which made several disclosures, including:

(a)     to "carefully review your coverage options, terms, and conditions as shown on the Option Form."

(b)     "The coverages you select are legally binding and enforceable. Therefore, they should reflect your personal insurance needs."

(c)     "Remember: If you do not choose to sign your forms electronically, you must sign and return the Option Form by mail.  Failure to do so may result in changes to your coverage and premium."

7

15.     After Mr. Richard established his login account, he was shown the first screen in the electronic signature process to sign the M-9 Form, and he clicked on "COMPLETE ELECTRONIC SIGNATURE."  Bates Aff. at ¶ 13 (DE 43-3); *see also* DE 43-12 at p. 2.

16.     GEICO then presented Mr. Richard with a disclosure in order to obtain Mr. Richard's consent to sign the M-9 Form electronically, which Mr. Richard consented to by selecting the "I agree" and "Continue" buttons.  Bates Aff. at ¶ 13 (DE 43-3); *see also* DE 43-12 at p. 4.  This consent page advised Mr. Richard of numerous items, including the following directly above the "I agree" button:

> **I have read the information about the use of my electronic signature and I consent to the use of my electronic signature on the Option Form in connection with my rate quote and/or policy with GEICO.  I agree that I am able to view the option Form using my computer software in accordance with the technical requirements listed in this document.  I consent to the use of electronic signatures in connection with my Option Form with GEICO in place of paper documents and handwritten signatures.  I also understand that my electronic signature represents my informed consent to accept my coverage selections.**

17.     After selecting "I agree" and "Continue," GEICO's online system presented Mr. Richard with the M-9 Form corresponding to his decision to reject UM coverage.  Bates Aff. at ¶ 14 (DE 43-3); *see also* DE 43-12 at p. 6.  Mr.

Richard electronically signed the M-9 Form at 5:15 p.m.  Bates Aff. at ¶ 11, 15, 17(f) (DE 43-3); *see also* DE 43-12 at pp. 7-8.  A copy of the electronically signed M-9 Form is attached as DE 43-13.  Bates Aff. at ¶ 15 (DE 43-3).

18.     After signing the M-9 Form Mr. Richard had the opportunity to download a copy of it.  Bates Aff. at ¶ 16 (DE 43-3); *see also* DE 43-12 at p. 10.

19.     Evidence of Mr. Richard's review and signing of the M-9 Form is further documented in GEICO's records of Mr. Richard's activities on GEICO's website.  Bates Aff. at ¶ 17 (DE 43-3).  Attached as DE-14 is GEICO's Page Log History for March 8, 2007, which evidences that the following online events occurred on March 8, 2007[4]:

(a)     At 5:13 p.m. Mr. Richard completed the password authentication on GEICO's website, identified as "password auth" on DE 43-14, which is the process that Mr. Richard went through on GEICO's website to establish his online account.  Bates Aff. at ¶ 17(a) (DE 43-3); *see also* DE 43-14.  During this process, Mr. Richard chose a user I.D., password, and he selected security questions and answers.  *Id*.

(b)     Also at 5:13 p.m. Mr. Richard logged into GEICO's website.  Bates Aff. at ¶ 17(b) (DE 43-3); *see also* DE 43-14.

---

[4] The Page Log History is an Excel file, which does not format well as a PDF. After filing this motion undersigned counsel will request permission to submit the Excel file to the Court.

(c)     At 5:14 p.m. GEICO's system verified the email address that Mr. Richard had previously entered.  Bates Aff. at ¶ 17(c) (DE 43-3); *see also* DE 43-14.

(d)     Also at 5:14 p.m. Mr. Richard began the electronic signature process to review and sign the M-9 Form.  Bates Aff. at ¶ 17(d) (DE 43-3); *see also* DE 43-14.

(e)     Also at 5:14 p.m. Mr. Richard signed the M-9 Form, which is designated as "esignSubmit" on the Page Log History.  Bates Aff. at ¶ 17(d) (DE 43-3); *see also* DE 43-14.

(f)     At 5:15 p.m. Mr. Richard completed the electronic signature process for the M-9 Form, which is designated as "esign_completed" on the Page Log History.  Bates Aff. at ¶ 17(f) (DE 43-3); *see also* DE 43-14.

(g)     Also at 5:15 p.m. Mr. Richard reviewed his "enrollment preferences," which allows the customer to set his or her preferences with respect to various items, such as paperless billing and paperless document delivery.  Bates Aff. at ¶ 17(g) (DE 43-3); *see also* DE 43-14.

20.     Mr. Richard does not deny signing the M-9 Form.  Instead, he testified at deposition that does not "recall" or "remember" signing it.  O. Richard Depo. at DE 43-5, 24:6-23.

21.    On March 8, 2007, GEICO sent Mr. Richard various documents, including a copy of his policy, a document describing and defining the types of coverages available, which included a detailed description of UM coverage, and a declarations page.  Smith Aff. at ¶ 13 (DE 43-1); *see also* DE 43-15.  This declarations page reflected the following with respect to UM coverage: "INSURED REJECT".  Smith Aff. at ¶ 13 (DE 43-1); *see also* DE 43-15, p. 9.

22.    Mr. Richard never paid, and GEICO never charged, premiums for UM coverage from the Policy's inception through the date of the accident.  Smith Aff. at ¶ 14 (DE 43-1).

23.    Prior to the March 27, 2011 automobile accident at issue, Mr. Richard received **eight** renewal notices, dated July 24, 2007, January 22, 2008, July 26, 2008, January 23, 2009, July 26, 2009, January 23, 2010, July 26, 2010, and January 23, 2011.  *See* Smith Aff. ¶ 15 (DE 43-1); DE 43-19.

24.    Each of these renewal notices included:

(a)    a declarations page stating that "INSURED REJECTS" UM coverage;

(b)    a standalone one page document titled IMPORTANT INFORMATION ABOUT UNINSURED MOTORIST COVERAGE.  This document advised Mr. Richard:

> Now is a good time to consider the Uninsured Motorist coverage options that are available to you and decide

11

whether you want to make any changes to your coverage. This coverage protects you, your resident family members and your passengers in the event of bodily injury sustained in an accident for which an unidentified, uninsured, or underinsured driver is legally liable.

You have the right to:

…

2. Select Stacked Uninsured Motorist Coverage at a limit equal to or lower than your Bodily Injury Liability coverage, but not lower than the minimum of $10,000/$20,000; or

…

Please contact our customer service department at 1-800-841-3000 if you wish to request or change coverage.

*See* DE 43-19.

25.     Between March 8, 2007, when Mr. Richard signed the M-9 Form, through the accident, Mr. Richard logged into GEICO's website to access his policy on over 20 different occasions.  Bates Aff. at ¶ 18 (DE 43-3); DE 43-16, which is the Event Log History documenting Mr. Richard's activities on the GEICO website from January 26, 2008 through March 4, 2012[5].  For example, Mr. Richard made changes to the Policy online through GEICO's website on August 17, 2008, May 4, 2009, and August 18, 2009.  *Id.*

---

[5] The Event Log History is an Excel file, which does not format well as a PDF. After filing this motion undersigned counsel will request permission to submit the Excel file to the Court.

26.    Following the accident, Mr. Richard added UM coverage to the Policy online through GEICO's website on April 21, 2011.  Bates Aff. at ¶ 19 (DE 43-3); DE 43-16.  Mr. Richard also electronically signed a second M-9 Form on April 21, 2011 confirming his purchase and selection of UM coverage.  Smith Aff. at ¶ 16 (DE 43-1); Bates Aff. at ¶ 20 (DE 43-3); April 21, 2011 M-9 Form, attached as DE 43-17.  During April 2011, Mr. Richard did not purchase UM coverage equal to the Policy's bodily injury insurance limits, as he requests in this lawsuit.  Smith Aff. at ¶ 17 (DE 43-1).  Instead, he purchased stacked UM coverage in the amount of $25,000 per person, $50,000 per incident, which is significantly less than his bodily injury coverage limits.  *Id.*

### III. Memorandum of Law

#### A. Summary Judgment Standard

Summary judgment is appropriate only if there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  A genuine issue of material fact exists if the "evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  But "an inference based on speculation and conjecture is not

reasonable." *Chapman v. Am. Cyanamid Co.*, 861 F.2d 1515, 1518 (11th Cir. 1988).

"Although all justifiable inferences are to be drawn in favor of the nonmoving party, the moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing of an essential element of the case." *Manor Healthcare Corp. v. Lomelo,* 929 F.2d 633, 636 (11th Cir.1991). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), and a "scintilla" of evidence or conclusory allegations is insufficient. *Celotex Corp.,* 477 U.S. at 324 (quoting Fed.R.Civ.P. 56(e)).

## B. Background and intent of § 627.727

Florida Statute § 627.727 (2007) provides in pertinent part that an insured's signature on an authorized UM waiver form entitles the insurer to a conclusive presumption of a rejection of UM benefits, as follows:

> The rejection or selection of lower limits shall be made on a form approved by the office. The form shall fully

advise the applicant of the nature of the coverage and shall state that the coverage is equal to bodily injury liability limits unless lower limits are requested or the coverage is rejected. The heading of the form shall be in 12-point bold type and shall state: "You are electing not to purchase certain valuable coverage which protects you and your family or you are purchasing uninsured motorist limits less than your bodily injury liability limits when you sign this form. Please read carefully." **If this form is signed by a named insured, it will be conclusively presumed that there was an informed, knowing rejection of coverage or election of lower limits on behalf of all insureds.**

§ 627.727(1), Fla. Stat. (2007) (emphasis added); *see also* § 627.727(9), Fla. Stat. (2007) (providing that "[i]f this form is signed by a named insured, applicant, or lessee, it shall be conclusively presumed that there was an informed, knowing acceptance of such limitations.").

The Legislature's "purpose for enacting the amendment was to ease the burden placed on insurance companies by the case law of Florida in proving that an insured knowingly rejected higher limits of UM coverage by requiring a 'paper trail' as conclusively presumptive evidence of that fact." *Liberty Mut. Ins. Co., Inc. v. Ledford*, 691 So. 2d 1164, 1166 (Fla. 2d DCA 1997) (citing *Auger v. State Farm Mut. Auto. Ins. Co.*, 516 So.2d 1024, 1025 (Fla. 2d DCA 1987)); *see also Coccaro v. Geico Gen. Ins. Co.*, 648 Fed. Appx. 876, 879-80 (11th Cir. 2016).

Relying on the conclusive presumption, courts have dismissed causes of action against insurers where the insured signed an approved UM waiver form. *See*

*Brannan v. GEICO Indem. Co.*, 569 Fed. Appx. 724, 727 (11th Cir. 2014)

(affirming summary judgment where insured signed the same version of the

GEICO M-9 form at issue in the instant case, version M-9-FL (11-96)); *see also*

*Schabo v. GEICO Gen. Ins. Co.*, Case No. 06-61906-CIV Cooke/Brown, DE 59

(S.D. Fla. Jan. 18, 2008), *aff'd*, No. 08-10632 (11th Cir. July 10, 2008) (granting

GEICO summary judgment based on the conclusive presumption created by the

insured's signature on the same version of the GEICO M-9 form at issue in the

instant case)[6]; *Mitleider v. Brier Grieves Agency, Inc.*, 53 So. 3d 410, 413 (Fla. 4th

DCA 2011) (affirming dismissal of suit where insurer was entitled to conclusive

presumption that insured waived UM coverage).

## C. Mr. Richard's signed M-9 Form creates a conclusive presumption that he made an informed and knowing rejection of UM coverage

An "insured's written rejection constitutes a *prima facie* showing that

uninsured motorist coverage does not apply." *State Farm Mut. Auto. Ins. Co. v.*

*Parrish*, 873 So. 2d at 549.  In *Parrish*, the court held that where a UM rejection

form is unambiguous, an insured is entitled to rely on the insured's signature,

therefore creating a "conclusive presumption" of the insured's knowing and

voluntary waiver of stacking UM coverage.  *Id.* at 550-51; *see also* § 627.727(1),

Fla. Stat. (2007).

---

[6] The *Schabo*'s court's opinion and the Eleventh Circuit's opinion affirming the entry of summary judgment in GEICO's favor is attached as DE 43-18.

Here, GEICO obtained a written rejection of UM coverage from Mr.

Richard, a named insured[7], on a form which was approved by the OIR. *See* DE 43-

9, 10, and 13; *see also* Franklin Aff. at ¶ 11 (DE 43-4).  GEICO never charged Mr.

Richard, and Mr. Richard never paid for, UM coverage from the Policy's inception

through the date of the accident.  *See* Smith Aff at ¶ 14 (DE 43-1).  GEICO has

made a "prima facie" showing by providing the signed, OIR approved M-9 Form,

and is therefore entitled to § 627.727(1)'s conclusive presumption that Mr.

Richard's rejection of UM coverage was informed and knowing.

Upon presentation of a signed UM election form, the burden of proof shifts

to the insured.  *See Lewis v. Liberty Mutual Fire Ins. Co.*, 789 F. Supp. 2d 1289,

1293 (S.D. Fla. 2011).  The insured then can only overcome the conclusive

presumption by establishing exigent circumstances such as fraud, trickery, or

forgery.  *Larusso v. Garner*, 888 So. 2d 712, 718 (Fla. 4th DCA 2004).  With

respect to overcoming the conclusive presumption:

> Insurance companies rely on Department of Insurance
> approval in taking these applications and issuing
> insurance based upon the rejection of uninsured motorist
> protections as indicated on these forms.    Lower
> premiums are charged as a result of such rejections.  So
> that the insurer can adequately establish its risks and
> charge appropriate premiums, the Legislature created a
> conclusive presumption that the signing of the approved

---

[7] *Cont'l Ins. Co. v. Roth*, 388 So. 2d 617, 618 (Fla. 3d DCA 1980) (A rejection of uninsured motor vehicle coverage by a named insured is effective against all other persons entitled to coverage under the policy, including the other named insureds.).

17

> form established a knowing acceptance of the limitations.
> Therefore, unless circumstances such as fraud, trickery,
> or forgery are present, the insured is bound by his
> signature on the form.

*Id.* The conclusive presumption afforded with "a signature on such a form can be refuted in **extraordinary** cases involving fraud, forgery, or trickery." *Johnson v. Stanley White Ins.*, 684 So. 2d 248, 250 (Fla. 2d DCA 1996) (emphasis added); *see also State Farm Mut. Auto. Ins. Co. v. Parrish*, 873 So. 2d at 550 ("Absent exigent circumstances such as forgery, fraud, or trickery, the insured is deemed to be bound by his signature on an informed rejection form.").

In the absence of proper allegations of forgery, fraud, or trickery, summary judgment is proper and will be affirmed. *Long v. Prudential Prop. & Cas. Ins.*, 707 So. 2d 390, 392 (Fla. 5th DCA 1998) (holding that the signed form created a conclusive presumption of waiver and affirming final summary judgment where plaintiff did not allege that insured's "rejection of uninsured motorist coverage was obtained by forgery, fraud, or trickery or that his waiver was uninformed").

### (1) Plaintiff's allegation of "trickery" fails as a matter of law and cannot overcome § 627.727's conclusive presumption

Plaintiff has not alleged fraud or forgery, but she does allege that GEICO "engaged in trickery through its online process … it appears that GEICO's online process automatically rejected uninsured motorist coverage for her father, Oscar

Richard, when he was applying online for coverage on March 7, 2007." *See* Third

Amended Complaint at ¶ 15 (DE 35).  This argument fails for three reasons.

### (a) First - GEICO's online process did not automatically reject UM coverage and, instead, allowed Mr. Richard to select UM coverage as part of the online application process

Plaintiff's claim that GEICO's online process automatically rejected UM

coverage during Mr. Richard's online application is misleading and inaccurate

because, during the online application process, Mr. Richard had the opportunity to

select UM coverage.  *See* Smith Aff. at ¶ 6 (DE 43-1); *see also* Smith Depo. at DE

43-20, 32:8-22; 34:4-12.

Plaintiff has no evidence supporting this incorrect factual claim because Mr.

Richard testified at deposition that he does not recall the online application

process.  *See* O. Richard Depo. at DE 43-5, 8:20-9:12; 31:16-18; 44:15-25.  Mr.

Richard also testified that he does not recall what insurance he initially purchased

from GEICO during 2007.  *Id*. at 21:12-22:1.  Moreover, Mr. Richard does not

deny that he signed the M-9 Form – he merely testified that he does not "recall" or

"remember" signing it.  *Id.* at 24:6-23; 32:1-6; 40:19-41:18; 42:9-43:1.  Therefore,

Plaintiff's claim that GEICO's online process automatically rejected UM coverage

is incorrect because Mr. Richard had the opportunity during the online process to

select UM coverage.

**(b) Second – Plaintiff's trickery claim fails because Mr. Richard spoke with a GEICO sales agent after completing the online application, and the sales agent recommended UM coverage**

Plaintiff's trickery claim is belied by the fact that, after completing the online application, Mr. Richard spoke with a GEICO sales agent who explained the nature of UM coverage and specifically recommended that Mr. Richard purchase UM coverage. *See* Battaglia Aff. at ¶ 6 (43-2); DE 43-6, pp. 10-11. Accordingly, even if GEICO's online system automatically rejected UM coverage during Mr. Richard's online application process – which is not supported by the evidence – GEICO recommended that Mr. Richard purchase UM coverage during the sales call. Plaintiff is unable to rebut this testimony because Mr. Richard testified at deposition that he does not even remember speaking with a GEICO representative as part of the application process. *See* O. Richard Depo. at DE 43-5, 7:19-25; 8:20-9:12; 22:2-8; 24:20-23.

**(c) Third – Assuming *arguendo* that GEICO's online process automatically rejected UM coverage this does not rise to the level of trickery required to overcome § 627.727's conclusive presumption**

Lastly, even if Plaintiff established that GEICO's online process automatically rejected UM coverage, which is not supported by the evidence, this does not rise to the level of "trickery" required to overcome § 627.727's conclusive presumption for two reasons. First, the alleged trickery must directly relate to the insured being tricked into **signing the M-9 Form**, and not a general allegation of

20

trickery during the application process.  *See Vasquez v. Bankers Ins. Co.*, 502 So. 2d 894, 896 (Fla. 1987) ("There was no evidence presented indicating that she was tricked or forced into signing this paragraph against her will. Absent any evidence establishing that the Moores did not knowingly and voluntarily sign the rejection form, the trial court erred in not granting the motion for directed verdict."); *see also Liberty Mut. Ins. Co. v. Day*, 13-80138-CIV, 2013 WL 12097570, at *3 (S.D. Fla. 2013) ("The insured has not claimed the rejection of uninsured motorist benefits was obtained by forgery, fraud or trickery."); *Long v. Prudential Prop. & Cas. Ins.*, 707 So. 2d 390, 392 (Fla. 5th DCA 1998) ("Accordingly, since Dianna Long did not allege that her husband's rejection of uninsured motorist coverage was obtained by forgery, fraud, or trickery or that his waiver was uninformed, the trial court correctly entered summary final judgment in favor of Prudential."); 6 Fla. Prac., Personal Injury & Wrongful Death Actions § 24:7 (2016-2017 ed.) ("This conclusive presumption does not, however, prevent the introduction of evidence to establish that the form was forged or the signature was obtained by fraud or trickery.").

Second, assuming *arguendo* that GEICO's online system automatically rejected UM coverage, this does not rise to the level of trickery needed overcome § 627.727's conclusive presumption.  GEICO could not locate any Florida state or federal case that provided a definition for, or the elements of, trickery in the UM

21

context.  However, the UM coverage case law that references trickery equates it with the intentional acts of forgery or fraud.  The Oxford English Dictionary defines trickery as "[t]he practice of tricks; deceitful conduct or practice; deception, artifice; imposture."[8]  Black's Law Dictionary (10th ed. 2014) defines trickery as "[t]he use of subterfuge or stratagems to deceive, esp. to induce some action or statement by another."; *see also Long v. State*, 622 So. 2d 536, 538 (Fla. 1st DCA 1993) ("Fraud is defined in *Webster's New World Dictionary* (3d college ed. 1988), as 'deceit, trickery or cheating.... [I]ntentional deception to cause a person to give up property or some lawful right.'"); *Clack v. Wollschlager*, 11-12-00269-CV, 2014 WL 2109384, at *7 (Tex. App. 2014), *review denied* (Aug. 8, 2014) ("'Trickery' is defined as 'the practice of crafty underhanded ingenuity to deceive or cheat.' Webster's New Collegiate Dictionary 1336 (11th ed.2004)."); *Husky Intern. Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016) ("Although 'fraud' connotes deception or trickery generally, the term is difficult to define more precisely.").

Florida courts have analyzed what constitutes "trickery" in the criminal context to determine whether law enforcement's use of trickery rendered a confession involuntary.  *See State v. McCord*, 833 So. 2d 828, 829 (Fla. 4th DCA

---

[8] http://www.oed.com/view/Entry/205850?redirectedFrom=trickery#eid (Last visited on October 10, 2016)

2002) ("The state appeals an order granting a motion to suppress DNA evidence taken from the defendant by means of police trickery."); *see also United States v. Jaimez*, 571 Fed. Appx. 935, 937 (11th Cir. 2014) ("We have found that consent 'induced by deceit, trickery, or misrepresentation' can render consent involuntary.").

In *McCord*, the court affirmed the trial court's suppression of DNA evidence "taken from the defendant by means of police trickery." *State v. McCord*, 833 So. 2d at 829 ("In the context of obtaining a confession, the use of police trickery may result in the exclusion of the confession depending upon the level of trickery employed.").  The detective in *McCord* lied to the defendant by claiming that the defendant was a suspect in a fabricated rape case.  The detective created this lie in order to obtain the defendant's DNA sample for use in an unrelated robbery investigation.  McCord provided the DNA sample to the detective in order to clear his name in the rape case, but the detective never told McCord that he was a suspect in the robbery investigation, or that the true reason for obtaining the DNA sample was for use in the robbery investigation.

While *McCord* involves different facts and law, it is useful to show the types of lies and deception needed to establish "trickery."  Additionally, the dictionary definitions and case law defining trickery equate trickery with deceit, misrepresentation, artifice, imposture, and cheating – in other words, intentional

23

conduct that is similar to fraud.  Conversely, Plaintiff here merely alleges that

GEICO's online process "automatically rejected uninsured motorist coverage"

during Mr. Richard's application process.  This bare allegation – unsupported by

evidence because Mr. Richard does not recall the application process – does not

constitute the type of conduct constituting trickery.

　　　　To the contrary, the only evidence before the Court is that (a) Mr. Richard

had the opportunity to select UM coverage during GEICO's online application

process; (b) GEICO's sales agent recommended UM coverage to Mr. Richard

during the sales call prior to Mr. Richard's purchase of the Policy; (c) Mr. Richard

signed the M-9 Form and he makes no claim of trickery in procuring his signature

on that form; and (d) prior to the accident, GEICO sent Mr. Richard numerous

renewal notices advising him that he did not have UM insurance and

recommending that he purchase it.  Therefore, the Court should find as a matter of

law that Plaintiff's conclusory allegation of trickery cannot overcome the

conclusive presumption created by Mr. Richard's signed M-9 Form rejecting UM

coverage.

### (2) An electronic signature has the same force and effect as a handwritten signature

Florida law treats an electronic signature the same as a handwritten

signature.  The Legislature enacted the "'Electronic Signature Act of 1996,' which

specifically provides that '[u]nless otherwise prohibited by law, an electronic

signature may be used to sign a writing and shall have the same force and effect as a written signature.'"  *Haire v. Florida Dept. of Agric. & Consumer Services*, 870 So. 2d 774, 790 (Fla. 2004) (quoting § 668.004, Fla. Stat. (2003)).  Furthermore, under the Uniform Electronic Transaction Act ("UETA"), the Legislature provided that for commercial transactions, "[i]f a provision of law requires a signature, an electronic signature satisfies such provision.  § 668.50(7)(d), Fla. Stat. (2007). Under § 668.50(7)(a), Fla. Stat. (2007), "[a] record or signature may not be denied legal effect or enforceability solely because the record or signature is in electronic form."; *see also* § 668.50(7)(c), Fla. Stat. (2007) ("If a provision of law requires a signature, an electronic signature satisfies such provision."); *Haire*, 870 So. 2d at 789 (Fla. 2004) (upholding validity of electronically-signed search warrant under the Florida Electronic Signature Act).

Mr. Richard agreed to conduct the subject transaction by electronic means even though he had the option to refuse.  *See* DE 43-12, p. 4; *see also* § 668.50(5)(b), Fla. Stat. (2007).  Therefore, Mr. Richard's electronic signature on an approved form is in accordance with the presumption under § 627.727(1) that there was an informed and knowing waiver of coverage.

In discussing the definition of "electronic signature"[9] in the UETA, the

National Conference of Commissioners on Uniform State Laws has explained that:

> *This definition includes as an electronic signature the standard webpage click through process.* For example, when a person orders goods or services through a vendor's website, the person will be required to provide information as part of a process which will result in receipt of the goods or services. *When the customer ultimately gets to the last step and clicks "I agree," the person has adopted the process and has done so with the intent to associate the person with the record of that process.* The actual effect of the electronic signature will be determined from all the surrounding circumstances, however, the person adopted a process which the circumstances indicate s/he intended to have the effect of getting the goods/services and being bound to pay for them. The adoption of the process carried the intent to do a legally significant act, the hallmark of a signature.

*Forsyth v. First Trenton Indem. Co.*, A-5080-08T2, 2010 WL 2195996, at *7 (N.J.

Super. Ct. App. Div. 2010) (emphasis in original) (quoting National Conference of

Commissioners on Uniform State Laws, prefatory note and comments, available at

http.www.upenn.edu/bll/archives/ulc/fnact99/1990s/ ueta99.pdf).

Thus, under the UETA, an electronic signature can be created through the

process of "clicking through a series of screens to affirm an intention to make an

---

[9] An "electronic signature" is defined by the UETA as an "electronic sound, symbol, or process attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record." Fla. Stat. § 668.50(2)(h). A "record" in turn means "information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form." *Id.* § 668.50(2)(m).

Internet purchase" or in the process of "clicking on a button" to indicate agreement.  Fry, *Introduction to the Uniform Electronic Transactions Act: Principles, Policies and Provisions*, 37 Idaho L. Rev. 237, 257 (2001).

GEICO's online signature process, which Mr. Richard used to sign the M-9 Form, is exactly the sort of electronic process that is valid and binding under the UETA.  After clicking the "COMPLETE ELECTRONIC SIGNATURE" button on the Complete Required Forms Now page, Mr. Richard then clicked "I agree" and "continue" on the Consent for Use of Electronic Signatures on an Insurance Coverage Option Form page.  Bates Aff. at ¶¶ 13-15 (DE 43-3); *see also* DE 43-12.

The GEICO system then presented Mr. Richard with the M-9 Form that Mr. Richard electronically signed, and he selected the button at the bottom of the UM Form "Click to complete electronic signature."  *See* DE 43-12.  Clicking on the button therefore constitutes a binding electronic signature under Florida law.  *See Leatherwood v. Cardservice Int'l, Inc.*, 929 So. 2d 616, 617 (Fla. 4th DCA 2006) (enforcing internet "click agreement" where consumer entered into enforceable contract by clicking on an "I accept" button).  Indeed, such agreements are "routinely enforced" under the "usual rules governing the enforcement of contracts in general."  *Davis v. Avvo, Inc.*, No. 8:10–cv–2352–T–27TBM, 2011 WL 4063282, at *2 (M.D. Fla. Sept. 13, 2011) (enforcing agreement created when

computer user clicked "accepting terms and continue" button).  *See Siedle v. Nat'l Ass'n of Sec. Dealers*, 248 F. Supp. 2d 1140, 1143 (M.D. Fla. 2002) (applying Florida state law and enforcing terms and conditions of website "click agreement").

Thus, because there is no law prohibiting the electronic signing of UM election forms, Mr. Richard's signature on the UM election form must be given the same force and effect as if he had physically signed on paper.

### (3) GEICO's UM rejection form was approved by the State of Florida Office of Insurance Regulation

Plaintiff may claim that the M-9 Form that Mr. Richard signed was not approved by the OIR.  This is incorrect because the OIR approved the M-9 Form long before Mr. Richard signed it.  *See* Aff. of Danielle Franklin at ¶ 7 (DE 43-4); *see also* DE 43-9 and 43-10; *Brannan v. GEICO Indem. Co.*, 569 Fed. Appx. 724, 727 (11th Cir. 2014); *Schabo v. GEICO Gen. Ins. Co.*, Case No. 06-61906-CIV Cooke/Brown, DE 59 (S.D. Fla. Jan. 18, 2008), *aff'd*, No. 08-10632 (11th Cir. July 10, 2008), discussed on pp. 15-16.

Therefore, Mr. Richard's signed OIR approved M-9 Form creates a conclusive presumption that Mr. Richard made an informed, knowing rejection of UM coverage.  *See* 627.727(1), Fla. Stat. (2007).

**D. Mr. Richard made an oral rejection of UM coverage**

Independent from Mr. Richard's signature on the M-9 Form, the undisputed evidence establishes that Mr. Richard made an oral rejection of UM coverage during his March 7, 2007 call with GEICO representative James Battaglia. Longstanding cases exist in Florida permitting oral wavier.  For example, in *Union Am. Ins. Co. v. Cabrera*, 721 So. 2d 313 (Fla. 3d DCA 1998), the court stated regarding oral rejections:

> However, under the case law it is also permissible for an insurer to "avoid the statutorily required [UM] coverage if it proves that the named insured orally waived the statutory requirement of a written rejection by knowingly selecting a lesser limit or by knowingly rejecting UM coverage."

*Id*. at 314.

Similarly, in *Muhammed v. Allstate Ins. Co.*, 582 So. 2d 768, 769 (Fla. 3d DCA 1991) the court held that an insurer could prove that the insured made a knowing rejection of UM coverage through means other than on an OIR approved form, such as through the use of an UM rejection form that "departs from the one statutorily provided by section 627.727…." :

In *Chmieloski v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, 563 So. 2d 164, (Fla. 2d DCA 1990), the court cited to *Quirk v. Anthony*, 563 So. 2d 710, 715 (Fla. 2d DCA 1990), in explaining that "an insurer can avoid the statutorily required coverage if it proves that the named insured orally waived the

statutory requirement of a written rejection by knowingly selecting a lesser limit or by knowingly rejecting UM coverage … [t]his requires proof of an oral rejection before the delivery of the policy, not proof of what the named insured hypothetically would have decided if the coverage had been offered." *Chmieloski*, 563 So. 2d at 166.

As detailed in paragraphs 3 – 7, above, Mr. Richard spoke with Mr. Battaglia on March 7, 2007 in order to complete his purchase of the Policy.  Mr. Battaglia and Mr. Richard discussed coverage options, including UM coverage, and Mr. Battaglia's and GEICO's standard business practice required Mr. Battaglia to recommend UM coverage and to explain the nature of UM coverage to a potential customer during the application process.  This evidence of an oral rejection is uncontroverted because Mr. Richard testified that (a) he does not remember the application process[10], and (b) he does not remember that he called GEICO to complete the Policy purchase on March 7, 2007[11].  Accordingly, the Court should find that Mr. Richard made an oral rejection of UM coverage on March 7, 2007.

---

[10] *See* O. Richard Depo. at DE 43-5, 8:20-9:12; 31:16-18; 44:15-25

[11] *Id*. at 7:5-25; 8:20-9:12.

**E. Mr. Richard's and Plaintiff's eight Policy renewals between March 8, 2007 and March 27, 2011 constituted a waiver of UM coverage**

Mr. Richard renewed the Policy eight times prior to the accident.  *See* DE 43-19.  As explained above, during each renewal, Mr. Richard received declaration pages reflecting that he rejected UM coverage and he received a one page document advising him of the importance of UM coverage and recommending that he purchase UM coverage.

The Eleventh Circuit Court of Appeals recently held, in affirming, in part, the dismissal of a class action complaint regarding GEICO's process on standing grounds, that the plaintiffs could not allege an ongoing injury.  Importantly, the court held that once the insureds renew the policy, they can no longer claim that their wavier was not knowing and voluntary, as follows:

> Moreover, **upon renewal, the Coccaros do not—and cannot—claim that they would be unknowingly rejecting higher UM coverage**. As Florida courts have held, the purpose of § 627.727(1) "was to ease the burden placed on insurance companies by the case law of Florida in proving that an insured knowingly rejected higher limits of UM coverage by requiring a 'paper trail' as conclusively presumptive evidence of that fact." *Liberty Mut. Ins. Co. v. Ledford*, 691 So.2d 1164, 1166 (Fla.Dist.Ct.App.1997). **Thus, the alleged future injury that would occur upon renewal could not be considered an ongoing violation of the statute.**

*Coccaro v. Geico Gen. Ins. Co.*, 648 Fed. Appx. 876, 879-80 (11th Cir. 2016) (emphasis added).  In this case, there is direct evidence that the Richards, like the

Coccaros, renewed their policy, and the renewal documents are the exact "paper trail" contemplated by the Florida Legislature as proof of a knowing and informed rejection.

Renewal has also constituted waiver of statutorily required limits by the Florida Supreme Court, as follows:

> Turning to the merits of the certified question, we agree with the second district that even if Marchesano did not knowingly reject the statutorily mandated uninsured motorist coverage at the time of the initial purchase, such a rejection subsequently occurred when the Marchesanos failed to act upon the form notification that Nationwide had enclosed with the premium notice. Section 627.727(1), Florida Statutes (1982).

*Marchesano v. Nationwide Prop. & Cas. Ins. Co.*, 506 So. 2d 410, 413 (Fla. 1987). And the *Chmieloski* court noted that once the policy was issued, it was possible that a proper annual notice could have validated the policy. *Chmieloski*, 563 So. 2d at 167. Thus, the opinion indicates that renewals can still be evidence of a knowing rejection. *Id.* at 166 & FN 1.

## F. Plaintiff's breach of contract action fails as a matter of law

Plaintiff's Third Amended Complaint alleges a single cause of action for breach of contract. "The elements of a breach of contract action are: (1) a valid contract; (2) a material breach; and (3) damages." *Abbott Labs., Inc. v. Gen. Elec. Capital*, 765 So. 2d 737, 740 (Fla. 5th DCA 2000); *see also Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) ("For a breach of contract claim,

Florida law requires the plaintiff to plead and establish: (1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach.").

Plaintiff's breach of contract action fails as a matter of law because she cannot establish that GEICO breached the contract (the Policy) because the Policy did not provide for UM coverage at the time of the accident.  *See* DE 43-15, pp. 8 – 9; *see also Manor Healthcare Corp. v. Lomelo*, 929 F.2d 633, 636 (11th Cir. 1991) ("Although all justifiable inferences are to be drawn in favor of the nonmoving party, the moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing of an essential element of the case.").

Plaintiff does not dispute that the Policy is the contract between the parties, and her alleged claim relates not to the contract itself, but to alleged disclosures made or not made prior to the Policy's inception.  Furthermore, the relief Plaintiff seeks is not to remedy a breach of the Policy's terms, but to reform the Policy to include coverage that neither Plaintiff nor Mr. Richard requested or paid premiums for.  Accordingly, summary judgment is appropriate because Plaintiff cannot establish that GEICO breached the Policy by failing to pay UM benefits because the Policy did not provide for UM benefits at the time of the accident.

33

## IV. Conclusion

For the foregoing reasons, GEICO respectfully requests that the Court grant summary judgment in GEICO's favor.

## Local Rule 7.1(F) Certification

This motion contains 7,962 words and undersigned calculated the word count at the time of filing using Microsoft Word's word count tool.

Respectfully submitted,

**SHUTTS & BOWEN LLP**
*Counsel for GEICO General Insurance Company*
200 S. Biscayne Boulevard
Suite 4100
Miami, Florida 33131
Tel:  (305) 358-6300

By: s/ Brad Redlien
Frank A. Zacherl
fzacherl@shutts.com
Florida Bar No. 0868094
Brad Redlien
Florida Bar No. 0778761
bredlien@shutts.com

## Certificate of Service

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by CM/ECF on the 31st day of October, 2016 on all counsel or parties of record on the Service List below.

By: s/ Brad Redlien
Of Counsel

34

## SERVICE LIST

Kenneth J. McKenna, Esq.
W. Doug Martin, Esq.
Dellecker Wilson King McKenna
Ruffier & Sos, LLP
719 Vassar Street
Orlando, FL 32804
kmckenna@dwklaw.com
wdmeservice@dwklaw.com
Counsel for Plaintiff

MIADOCS 13763968 8